IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| SAMUEL W.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-00031 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Samuel W. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying his application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is

before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative

record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports

the Commissioner's final decision. Accordingly, I recommend that the decision be reversed and

the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42
U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

Samuel applied for DIB in July 2019, Administrative Record ("R.") 149–50. He alleged

that he became disabled on April 25, 2019, R. 149, because of chronic pain, osteoarthritis,

depression, and anxiety, R. 165. Samuel was forty-eight years old, or a "younger person" under

the regulations, on his alleged onset date. R. 57; 20 C.F.R. § 404.1563(c). Disability

Determination Services ("DDS"), the state agency, denied his claim initially in November 2019,

R. 56–61, and upon reconsideration in April 2020, R. 62–68. In December 2020, Samuel

appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. *See* R.

33–54. A vocational expert ("VE") also testified at this hearing. *See* R. 48–53.

ALJ Rippel issued an unfavorable decision on January 8, 2021. *See* R. 15–28. Samuel

had "severe" medically determinable impairments ("MDIs") of lumbar degenerative disc disease,

degenerative joint disease of the lumbosacral spine, bilateral hip osteoarthritis, morbid obesity,

allergic rhinitis, avoidant personality disorder, major depressive disorder, and "somatization

disorder." R. 17–18. There is no indication that ALJ Rippel found Samuel had an MDI of

"anxiety" or anxiety-related disorder. R. 18, 21, 26; *see* R. 58–59 ("Though claimant reports

having anxiety and depression, evidence do[es] not diagnose him. . . . There is no mental

MDI."); R. 63–64 ("The claimant alleges depression and anxiety, but does not have active

diagnoses for either condition. . . . . [T]here is no MDI established for either alleged disorder of

depression or anxiety."). None of Samuel's "severe" impairments met or equaled a relevant

Listing. R. 18–20 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 12.04, 12.07, 12.08).

As part of this analysis, ALJ Rippel found that Samuel's mental MDIs imposed "no limitation"

on his overall capacities for understanding, remembering, or applying information and

interacting with others and at most a "moderate limitation" on his overall capacities for

concentrating, persisting, or maintaining pace and adapting or managing himself. R. 19 (citing R.

181–82, 535, 539, 543, 544–45).

    ALJ Rippel then evaluated Samuel's residual functional capacity ("RFC") and found that

he could perform "light" work[4] except that he could frequently balance and climb ramps/stairs;

occasionally stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; and tolerate

occasional exposure to cold extremes, respiratory irritants, vibrations, and workplace hazards. R.

20. Samuel could "sustain concentration and persistence for two-hour segments," but he needed

a job that offered "routine, customary breaks after about two-hour periods of work." *Id.* He could

not work at a "fast-pace production rate (defined as a setting in which a rapid pace of work is set

by a conveyor belt or other similar external source, as well as rapid assembly line work where

co-workers are side-by-side and the work of one affects the work of the other)," and he was

"limited to low-stress work (defined as involving only occasional independent decision making

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively
modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand
or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or
leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010)
(quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 20
(finding that Samuel could "perform light work . . . including lifting and/or carrying up to 20 pounds
occasionally and ten pounds frequently and standing and/or walking up to six hours and sitting up to six
hours in an eight-hour workday").

and/or changes in the work setting."). *Id.* ALJ Rippel later described this RFC as allowing "light

unskilled work," R. 26 (finding that Samuel could perform "most unskilled light work tasks"),

suggesting that he also intended to limit Samuel to work requiring "little to no judgment to do

simple duties that can be learned on the job in a short period of time," 20 C.F.R. § 404.1568(a)

(defining "Unskilled Work"). ALJ Rippel did not limit Samuel's workplace interactions with

supervisors, coworkers, or the public. R. 20; *see* R. 19 (citing R. 181–82, 535, 539, 543, 544–

45); R. 25 (citing R. 535, 539, 543, 544–45).

At step four, ALJ Rippel found that Samuel's RFC ruled out his past relevant work as a

shift supervisor and home-care attendant, both of which were "at least semiskilled and medium"

exertion jobs. R. 26. Based on the VE's testimony, however, ALJ Rippel found that Samuel still

could perform certain "light, unskilled occupations" (mail clerk, ticket seller, garment sorter) that

offered a significant number of jobs in the national economy. R. 27 (citing R. 49–51). Thus, ALJ

Rippel found that Samuel was not disabled from April 25, 2019, through January 8, 2021. R. 28.

The Appeals Council declined review, R. 1–3, and this appeal followed.

### III. Discussion

Samuel raises four challenges to ALJ Rippel's decision. *See generally* Pl.'s Br., ECF No.

13. First, he argues that the ALJ's evaluation of his mental impairments does not comport with

the requirements of SSR 96-8p. *Id.* at 6–8. Second, Samuel asserts that ALJ Rippel erred at step

two by failing to find that Samuel's social anxiety was an MDI distinct from his "severe" major

depressive disorder, avoidant personality disorder, and somatization disorder, and separately, by

failing to include any social-interactions restrictions in the RFC finding. *Id.* at 8–9. Third,

Samuel argues that the RFC finding does not account for his "severe" avoidant personality

disorder because it lacks any social-interaction restrictions and, separately, that the ALJ

improperly evaluated Samuel's symptoms from somatization disorder. *Id.* at 9–10. Lastly,

Samuel argues that ALJ Rippel erred in assessing his alleged symptoms at step two of the two-

step pain analysis set forth by *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996). Samuel's third

argument is persuasive.

A.      Summary

        1.      Relevant Medical Evidence

        In September 2017, Samuel presented to the Emergency Department at Sentara Halifax

Regional Hospital complaining of left posteriolateral hip pain radiating down his lower extremity

and low back pain. R. 272. Exam revealed full range of motion and tenderness to palpation over

the left lateral hip that reproduced Samuel's pain. R. 273. James McCubbin, M.D., diagnosed

osteoarthritis and ordered an X-ray of Samuel's hips and lumbar spine. *Id.* Samuel's hip X-ray

revealed "moderate degenerative joint changes," a loss of joint space, and a "generalized bony

spur formation around several joints." *Id.* A lumbar X-ray revealed "[m]ild multilevel lumbar

degenerative disc disease and moderate to severe facet arthrosis" at L4-L5, but no acute findings.

R. 436. Dr. McCubbin noted that Samuel had "moderate to severe degenerative changes in the

spine for someone his age." R. 274. Samuel was prescribed Prednisone, with no refills, Baclofen,

and Meloxicam. *Id.* Samuel had similar complaints of low back pain and left hip pain in October.

R. 234. An examination of his back revealed paraspinal muscle tightness and tenderness and

abnormal range of motion. R. 236. An examination of his hips showed pain with movement and

abnormal range of motion. *Id.* Mesfin Shibeshi, D.O., assessed chronic low back pain, bilateral

primary osteoarthritis of the hips, and morbid obesity, and he advised that Samuel's back and hip

problems were secondary to his obesity and that "there would not be any orthopedic intervention

that would improve his pain without weight loss." *Id.* Samuel was referred to a nutritionist. *Id.*

6

In May 2019, a CT scan of Samuel's pelvis revealed "[c]hronic degenerative changes in the lower lumbar spine, sacroiliac and hip joints." R. 430. Samuel again complained of back and hip pain in November, and he was assessed with osteoarthritis of the hips. R. 509. Bert Spetzler, M.D., and Louis Perrott, Ph.D., reviewed Samuel's records for DDS in November 2019. Dr. Spetzler opined that Samuel had three "severe" MDIs—disorders of the spine, diabetes, and obesity—and that he should be restricted to occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds; sitting and standing/walking for about six hours each in an eight-hour workday; "frequently" balancing and climbing ramps/stairs, and "occasionally" stooping, kneeling, crouching, and crawling, but never climbing ladders/ropes/scaffolds. Dr. Spetzler attributed these limitations to Samuel's "back pain, normal gait," and body mass index of 45.9. R. 60. Dr. Perrott noted that Samuel alleged disability based in part on "anxiety and depression," R. 58, but he found no evidence in the record establishing the existence of any "mental MDI," R. 59. Daniel Camden, M.D., and Andrew Bockner, M.D., generally affirmed these opinions after reviewing Samuel's updated records in April 2020. *See* R. 63–66.

In February 2020, Samuel saw Michael Kyles, M.D., for an evaluation of his hip pain. R. 510. Samuel said his right hip caused more pain than his left, but he said that he experienced pain in both hips when standing and walking. *Id.* Exam revealed "mild" deficiencies in hip range of motion ("ROM"), R. 512, and Dr. Kyles did "not suggest total hip replacement [at Samuel's current weight] even though [his] previous associate" had recommended that course of treatment, R. 510, 512. An X-ray of Samuel's pelvis revealed "no major radiographic changes of arthritis." R. 562. In March, at a follow up visit at Sentara Halifax Family Medicine, Samuel said he had been feeling weak, tired, and lethargic for the past few months. R. 544–45. He reported that "he was feeling down and he was isolating himself from the crowds," and he said that Effexor and

7

Celexa had not offered improvement in the past. R. 545. Exam findings were normal aside from

obesity. R. 545–46. Samuel was assessed with major depression, osteoarthritis of the hips,

diabetes, and hypertension, R. 544, and he was started on sertraline for depression, with a

possible referral to psychiatry if his symptoms did not improve, *id.* During a telephonic

encounter in April, Samuel said sertraline was "not helping his depression at all." R. 543.

Also in April, Samuel presented to Spectrum Medical after being referred for myalgia. R.

601. He had recently been put on Meloxicam, and he reported that it provided "some" relief, but

he was "hurting all over with [joint] pains in his neck, [lower back], shoulders, knees, and hips."

*Id.* Examination revealed soreness in the shoulders and hands and crepitus and soreness in the

knees, but findings were otherwise normal. R. 602–03. Sharukh Shroff, M.D., assessed

polyarthritis, bursitis of the left shoulder, hand pain, myalgia, insomnia, and fatigue, R. 603–04,

and he performed a steroid injection on Samuel's left shoulder, R. 603. At a follow up later in

April, Samuel reported that the injection helped, but he still complained of pain in his upper

arms. R. 597. Exam results were unchanged, R. 598–99, Dr. Shroff assessed myalgia, left

shoulder pain, insomnia, fatigue secondary to low testosterone, and obesity, R. 599, and he

prescribed a sterapred pack and Tizanidine for Samuel's myalgias, *id.* An MRI of Samuel's left

shoulder performed a few days later revealed "[n]o acute abnormalities." R. 611. When Samuel

presented to Spectrum Medical for a follow-up visit in May, he said the sterapred pack and

Tizanidine had helped and that he was tolerating his medications "well." R. 593. Exam findings

were the same, R. 594–95, and Dr. Shroff's assessment was unchanged, R. 595–96.

Later in May, Samuel presented to psychiatrist Gregory Weiss, M.D., at Sentara

Behavioral Health. *See generally* R. 533–46 (Ex. 8F). Samuel reported a fifteen-year history of

depression that had gotten "particularly bad" over the past six months. R. 540. Samuel said he

had little motivation to do anything, he spent most of his time watching television or doing housework, he had "always been a . . . socially anxious person," and he did "not like to look people in the eye and fe[lt] uncomfortable when talking to people." *Id.* He had recently started taking Cymbalta and sertraline, but he had not felt improvement in his anxiety or depression. R. 541. Mental status exam revealed depressed mood, full range of affect with a small amplitude of emotions, well-formed thought processes, and intact attention and concentration, insight, and judgment. R. 542. Dr. Weiss assessed mild episode of recurrent major depressive disorder, avoidant personality disorder, and somatization disorder, R. 542, and he increased Samuel's Cymbalta, started him on Wellbutrin, and discontinued sertraline, R. 542–43. Dr. Weiss noted that Samuel seemed "somewhat somatically preoccupied and ha[d] reasons why he is unable to do things," which Dr. Weiss said "seem[ed] at least to some degree psychologically motivated," and he felt that a lot of Samuel's issues derived from "his sedentary life and excessive weight." R. 542. Dr. Weiss planed to "maximize" Cymbalta if it helped Samuel's pain. *Id.* When Samuel saw Dr. Weiss again in June, he said his "[m]edication changes ha[d] been helpful in some respects but they ha[d] not helped in others." R. 537. He reported mood improvement, but said he was experiencing increased anxiety and irritability, which Dr. Weiss said was "likely due to Zoloft being stopped." *Id.* Samuel also did not feel like the Cymbalta was "doing much for his pain," so Dr. Weiss decided to "reverse course [and] go to a higher dose of Zoloft and discontinue the Cymbalta." *Id.* Mental status exam showed good mood, full and mood-congruent affect, well-formed thought processes, and intact attention and concentration, insight, and judgment. R. 539. Dr. Weiss's assessment was unchanged. He substituted Zoloft for Cymbalta and reduced Samuel's Wellbutrin dosage "to make sure that it [was] not contributing to the myoclonus that [he] was having" at the time. *Id.*

At a July visit with Kurt Voos, M.D., Samuel reported neck pain ongoing for about three years that had become worse in the last year and radiated to his left arms, as well as increased headaches and pain between his shoulders. R. 585. Samuel's average pain level was a six-out-of-ten, and NSAIDs and muscles relaxers had given him "only mild improvement." *Id.* A cervical X-ray demonstrated "mild" listhesis at C5-6 and C6-7 and "mild" diffuse degenerative changes of the cervical spine," and a thoracic X-ray showed "evidence of diffuse skeletal hyperostosis with significant involvement throughout the thoracic, and lesser extent, lumbar spine," and an accentuated thoracic kyphosis. *Id.* On exam, Samuel had tenderness throughout the cervical and interscapular region to the lower thoracic spine, worse in the midline; he had limited forward flexion of the cervical spine; and he was "unable to stand fully erect." R. 586. Dr. Voos assessed lumbar pain and thoracic pain, and he referred Samuel for physical therapy. *Id.*

Samuel followed up with Dr. Weiss in August, reporting some improvement in his anxiety with Zoloft, although he still had "a lot of anxiety at night." R. 533. He explained that his "mind is always thinking about things that could go wrong" and he constantly feels "that he is on the edge of disaster and that he is not getting anywhere." R. 533–34. "There [were] a lot of different tasks that he [got] frustrated by and overwhelmed" about. R. 534. For example, "[i]f he [was] working on one thing and something else interrupt[ed] him it [could] feel like he [would] never get[] anywhere on these tasks." R. 534. Mental status exam revealed "overwhelmed and anxious" mood, full affect, well-formed thought processes, and intact attention and concentration, insight, and judgment. R. 535. Dr. Weiss opined that Samuel's major depressive disorder "seem[ed] to be in full remission," but he was "struggling with how to handle responsibility and feeling overwhelmed by all the stress in his life. Much of this [was] real stressful a lot of it [was] coping skills and normal stresses that he can handle and [was] actually

handling fairly well but he [was] obsessing about [it]." *Id.* There was "a very somatic element to the way [Samuel] handle[d] things," and he thought Samuel felt "unable to handle things and [was] looking for some kind of relief so that he does not have to be in charge of everything and this gets expressed in a very physical rather than direct way." *Id.* Dr. Weiss's assessment was unchanged, and he increased Samuel's Zoloft and continued him on Wellbutrin. *Id.*

In September, Samuel followed up with Dr. Voos. R. 577. Examination revealed pain and soreness in his neck region, soreness in his shoulders, left shoulder bursitis, soreness in his hands, and soreness and crepitus in his knees. R. 579. Dr. Voos assessed myalgia, bursitis of the left shoulder, cervicalgia, insomnia, fatigue, and overweight, R. 579–80, continued Samuel on tizanidine and naproxen, and provided a left shoulder steroid injection, R. 579.

     2.     *Samuel's Statements*

Samuel submitted a Function Report to DDS in September 2019. *See* R. 176–83 (Ex. 4E). He reported difficulty lifting, bending, standing, sitting, and walking. R. 176. He needed reminders to take his medications, R. 178, he had difficulty driving, R. 179, and he shopped in stores once a week for about an hour, *id.* Samuel no longer went to church because of his pain. R. 180. He talked daily with a friend, but he did not "like being around a lot of people," R. 180–81. He could pay attention for three to five minutes, followed written instructions "good," and followed spoken instructions "[g]ood" when he remembered them. R. 181. Samuel got along "well" with authority figures, did not handle stress "very well at all," and handled changes in routine "fair." R. 182. He had never been fired from a job because of problems with other people. *Id.*

Samuel testified at an administrative hearing before ALJ Rippel in December 2020. *See* R. 35–54. He said he was unable to work because of back pain that made it uncomfortable to sit,

stand, or lie down; he had "a lot of trouble" with the nerves in his left arm; "just walking to [his]

car and back" caused his legs to give out; and his depression made it so he did not like to be

around others. R. 42–43. Samuel could stand for about twenty to twenty-five minutes before

needing to sit, and he could walk no more than 50 feet before needing to take a break. R. 43. He

constantly experienced depression and anxiety, R. 45, and he "rarely" went out in public, R. 46.

B.    *The ALJ's Decision*

ALJ Rippel found that Samuel had "severe" impairments of lumbar degenerative disc

disease, degenerative joint disease of the lumbosacral spine, bilateral hip osteoarthritis, morbid

obesity, allergic rhinitis, avoidant personality disorder, major depressive disorder, and

somatization disorder. R. 17–18. The ALJ's finding means that these MDIs, alone or combined,

caused "greater than minimal limitations" in Samuel's ability to do "basic work activities," R.

18, which according to the regulations include physical functions like walking, standing, sitting,

lifting, and carrying, as well as mental abilities like exercising judgment, dealing with changes in

a routine work setting, and responding appropriately to supervision co-workers, and usual work

situations, 20 C.F.R. § 404.1522(b)(1), (4)–(6).

In evaluating whether Samuel's "severe" mental impairments equaled a listed

impairment, ALJ Rippel assessed the "paragraph B criteria." *See* R. 19–20. He found Samuel had

"no limitation" overall in his abilities to understand, remember, or apply information and to

interact with others, and he found that Samuel had a "moderate limitation" overall in his abilities

to concentrate, persist, or maintain pace and to adapt and manage oneself. R. 19. In finding that

Samuel had no limits on interacting with others, ALJ Rippel acknowledged that Samuel had

reported "increased anxiety in crowds as well as difficulty making eye contact." R. 19 (citing R.

181–82, 535, 539, 543, 544–45). But, those symptoms were "not evident in his mental status

12

exams of record, which indicate[d] cooperative and appropriate social behaviors." *Id.* (citing R. 535, 539, 543, 544–45). He also found that Samuel "denied any issues getting along with authority figures and . . . reported no issues getting along with his coworkers in the past." *Id.* (citing R. 182). Based on this information, ALJ Rippel found it was "unlikely" that Samuel had "any difficulty in interacting with others." *Id.*

In assessing Samuel's RFC, ALJ Rippel summarized Samuel's statements regarding his symptoms, R. 21, summarized the medical evidence, R.21–25, and evaluated the opinion evidence, R. 25–26. ALJ Rippel found that Samuel's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Samuel's "statements concerning the intensity, persistence and limiting effects of [his alleged] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" for reasons explained elsewhere in his decision. R. 24.

Regarding Samuel's allegations of disabling back and joint paint, ALJ Rippel found the record was "only partially consistent," noting that Samuel had "received only limited treatment for his arthritic pain since his [AOD], which [did] not suggest disabling levels of pain," he had "only seen an orthopedic specialist on three occasions and during none of th[o]se visits was he referred for surgery," he did not follow through with a nutritionist "as advised in order to assist with weight loss and alleviate his back and hip pain," he "obtained at least partial relief through conservative treatment measures, including pain medications and injections," and he had "denied any side effects from these medications and [was] reportedly tolerating them well." R. 24–25. Additionally, it was "telling that [Samuel's] imaging of record ha[d] not indicated greater than mild degenerative changes in the spine or hips," and that Samuel's "exams of records ha[d] indicated normal gait, station, sensation, and strength," and Samuel testified that he did not need

an assistive device. R. 25. ALJ Rippel acknowledged that there was a "mental component" to Samuel's chronic pain, but he found that "despite these concurrent mental issues, [Samuel did] not present with obvious pain behaviors," noting that Samuel had "exhibited full range of affect with small amplitude of emotions," and that "despite his chronic pain, [Samuel] ha[d] been described as having normal cognition, concentration, attention, insight, and judgment." *Id.* Lastly, ALJ Rippel found Samuel's "course of mental health treatment suggest[ed] less severe mental symptoms than [] alleged," as the record did not indicate he engaged in mental health treatment until March 2020 and "when he did begin routine psychiatric care, [Samuel] responded well to his prescribed medications." *Id.*

C.    *Analysis*

Samuel's arguments challenge the ALJ's RFC finding. A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

Samuel argues that ALJ Rippel failed to account for his functional limitations attributable to severe avoidant personality disorder within the RFC finding. Specifically, Samuel contends

that although the ALJ found that he suffered from "severe" avoidant personality disorder, the

mental restrictions in the RFC finding do not appear to accommodate this condition, and the ALJ

never explained why Samuel's "severe" avoidant personality disorder did not require any

accommodations, such as a limitation on social interaction. *See generally* Pl.'s Br. 8–10.

At step two, ALJ Rippel concluded that Samuel suffered from "severe" avoidant

personality disorder. R. 17–18. A step two finding of a severe MDI indicates that the

impairment, or combination of impairments, causes more than a minimal impact on the

applicant's ability to do basic work activities. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir.

1984). Avoidant personality disorder "is characterized by 'a pervasive pattern of social

inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation . . . .'" *Morris v.

Astrue*, No. 11-cv-248, 2012 WL 4499348, at *5 n.5 (D.N.H. Sept. 28, 2012) (quoting American

Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 718 (4th ed.

2000)). Despite finding that Samuel suffered from "severe" avoidant personality disorder at step

two, ALJ Rippel found that it was "unlikely that [Samuel] ha[d] any difficulty in interacting with

others" when evaluating the "paragraph B" criteria at step three. R. 19 (citing R. 182, 535, 539,

543, 544–45). He included no limitations in the RFC on Samuel's ability to interact with others.

R. 20; *see* R. 24–25 (finding that Samuel's mental MDIs "could reasonably be expected to cause

[his] alleged symptoms," but that the limited "course of [his] mental health treatment suggest[ed]

less severe mental symptoms than he ha[d] alleged" (citing R. 535, 539, 543, 544–45)).

ALJ Rippel acknowledged that Samuel reported anxiety and difficulty making eye

contact, but he nonetheless concluded that Samuel had no limitations in interacting with others

(public, co-workers, supervisors). *See* R. 19–20. In making this finding, ALJ Rippel relied on

findings of cooperative and appropriate behavior on mental status exams, Samuel's reports that

he had no issues getting along with authority figures, and the absence of any reports

demonstrating that Samuel had issues getting along with coworkers in the past. R. 19 (citing R.

181–82, 535, 539, 543, 544–45). The ALJ also questioned the severity of Samuel's

psychological symptoms generally because Samuel did not seek mental health treatment until

March 2020, and he purportedly responded well to medications. R. 25 (citing R. 535, 539, 543,

544–45). *But see* R. 533, 535, 537, 541, 543 (reporting little, if any, relief from various anti-

depressant and anti-anxiety medications); R. 540 ("He did not have any insurance from 2010–

2019 so he did not seek care for depression even though he thinks that it has been pretty bad for

most of the time."); R. 545 ("He mentions that he has tried multiple medications including

Effexor, Celexa, with no improvement.").

      While the ALJ's reasons may support finding that Samuel's mental impairments,

including avoidant personality disorder, did not cause the full extent of symptoms and limitations

that Samuel alleged, the ALJ did not explain why he determined that the evidence supported

assigning no limitations to Samuel's "severe" avoidant personality disorder. Indeed, ALJ Rippel

included only two specific mental restrictions in Samuel's RFC: no "fast-paced production rate"

and limited to "low-stress" work. R. 20. ALJ Rippel also indicated that he intended to restrict

Samuel to "unskilled," or simple, work, R. 26–27, but that restriction is not in the RFC finding

itself, R. 20. None of these limitations are logically related to Samuel's "severe" avoidant

personality disorder, which, again, is a disorder marked by an abnormally "pervasive pattern of

social inhibition . . . and hypersensitivity to negative evaluation," *Morris*, 2012 WL 4499348, at

*5 n.5. Thus, despite finding that Samuel had "severe" avoidant personality disorder—and

finding that Samuel's MDIs could reasonably be expected to cause symptoms including social

anxiety, self-isolation, and trouble making eye contact, R. 19, 21, 23—the ALJ does not appear

to have provided any accommodations for that impairment's functional limitations within the

RFC finding, and he did not offer any explanation as to why he failed to do so. Without such an

explanation, the Court cannot determine whether the ALJ's rationale for the RFC finding

conflicts with his step two finding that Samuel's avoidant personality disorder caused more than

minimal effect on his ability to do work activities. *Cf. Patterson v. Comm'r of Soc. Sec. Admin.*,

846 F.3d 656, 659 (4th Cir. 2017) ("Th[e] RFC assessment is a holistic and fact-specific

evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2

concerning the type and severity of the claimant's impairments.").

As such, ALJ Rippel failed to "build an accurate and logical bridge" from the evidence

demonstrating that Samuel suffered from "severe" avoidant personality disorder to his apparent

conclusion that this impairment did not cause any work-related functional limitations, *Woods v.

Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), including on Samuel's ability to interact with

supervisors, peers, and/or strangers for eight hours a day, five days a week. Thus, the RFC

determination is not supported by substantial evidence. *Compare Claiborne v. Comm'r of Soc.

Sec.*, No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015) ("The conclusions at

step two are supposed to represent a reasoned consideration of all of the pertinent evidence, and

are not simply an opportunity to give the claimant the benefit of the doubt at one step while

taking it away at the next step."), *with* R. 26 ("Accordingly, the undersigned has given the

claimant the benefit of the doubt in finding his mental impairments to be severe but has not

found them to be disabling."); *cf. Earl O. v. Comm'r of Soc. Sec.*, No. 4:17cv54, 2018 WL

10807027, at *13 (W.D. Va. Nov. 13, 2018) (ALJ's "constant second-guessing of his already

ambiguous step-two determination frustrate[d] the Court's ability to meaningfully review" his

findings about the nature, severity, and functionally limiting effects of claimant's "questionably severe" mental impairment).

Samuel also argues that the ALJ erred in evaluating the symptoms related to his somatization disorder and the ALJ did not properly consider the effects of this impairment on his functional abilities. The regulations set out a two-step process for evaluating claimants' symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565. "The second [step] requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all relevant evidence in the record, 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility determination if his or her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

Applying this standard, I cannot find that ALJ Rippel's credibility determination is supported by substantial evidence. ALJ Rippel satisfied step one by finding that Samuel's

"medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 24. He erred at step two, however, by failing to adequately consider how Samuel's somatization disorder affected his pain symptoms and related functional capabilities.

ALJ Rippel discredited Samuel's allegations of joint and back pain, reasoning that Samuel had received "limited" treatment for those impairments during the relevant period, he had not been referred for surgery by an orthopedic specialist, he failed to follow recommended treatment, and he obtained "partial" relief from "conservative treatment" and denied any side effects from the treatment. R. 24–25. Additionally, Samuel's imaging did "not indicate greater than mild degenerative changes in the spine or hips," "his exams of record [] indicated normal gait, station, sensation, and strength," and Samuel himself reported that he did not require an assistive device. R. 25. ALJ Rippel acknowledged that there was a "mental component" to Samuel's chronic pain, but found that "despite these concurrent mental issues, [Samuel did] not present with obvious pain behaviors." *Id.* (citing R. 535, 539, 543, 544–45). Further, Samuel had "exhibited full range of affect with small amplitude of emotions," and he had "been described as having normal cognition, concentration, attention, insight, and judgment." *Id.* (citing R. 535, 539, 543, 544–45). Lastly, ALJ Rippel found that Samuel's "course of mental health treatment suggest[ed] less severe mental symptoms than" Samuel alleged, noting that the record did not show "engagement in mental health treatment until March 2020 and when [Samuel] did begin routine psychiatric care, [he] responded well to prescribed medications." *Id. But see* R. 533, 535, 537, 540–41, 543, 545.

This analysis fails to account for the nature of Samuel's severe somatization disorder. Somatization disorder is a form of somatoform disorder. *See Tedford v. Colvin*, No. C12-4076-LTS, 2013 WL 3338477, at *15 n.3 (N.D. Iowa July 2, 2013). "[A] somatoform disorder is a

psychiatric disorder that causes unexplained physical symptoms, including pain. That is, there are no objective physical indicators of pain caused by a somatoform disorder, and yet that pain is genuine and may be disabling." *Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251, 272 (4th Cir. 2017) ("[T]he ALJ's conclusion that there was insufficient medical evidence to corroborate Brown's claim of pain is incongruous with the ALJ's finding that Brown suffered from a severe somatoform disorder."). Thus, while an absence of corroborating objective findings may be one legitimate basis for discrediting allegations of pain from run-of-the-mill physical impairments, it is not a proper basis for discrediting a claimant's allegations of pain where, as here, the claimant suffers from a somatoform disorder. *See id.*; *compare Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 97 (4th Cir. 2020) (holding that "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence" because "[o]bjective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's symptoms" resulting from such disorders), *with Niemer v. Saul*, No. 19-cv-627, 2020 WL 563943, at *3 (E.D. Wisc. Feb. 5, 2020) (finding ALJ properly relied on the lack of corroborating objective evidence, among other factors, to discredit allegations of difficulty standing and walking from foot pain).

Here, ALJ Rippel properly relied on generally normal objective findings on physical examinations to raise questions about the severity of Samuel's alleged symptoms and limitations regarding his physical impairments of lumbar degenerative disc disease, degenerative joint disease of the lumbosacral spine, and bilateral hip osteoarthritis. R. 25. He also discredited Samuel's alleged symptoms from these impairments based on Samuel's "limited" treatment for

his arthritic pain, his having seen an orthopedic specialist on only three occasions and not having been referred by an orthopedic specialist for surgery, his failure to follow through with a recommendation to see a nutritionist, the "partial" relief he obtained through "conservative treatment," which he tolerated "well," and Samuel's own reports that he did not require an assistive device. R. 24–25.

These findings are generally supported by the record, *see* R. 236 (referral to nutritionist); R. 577 (Samuel reporting a muscle relaxer and sterapred pack "helped him" and "tolerating the meds well at th[at] time"); R. 510 ("I would not suggest total hip replacement even though my previous associate recommended hip replacement."), and they are proper considerations under the regulations. *See* 20 C.F.R. § 404.1529(c). Nonetheless, it remains unclear how these findings indicate that Samuel did not experience the level of physical pain he alleged as a result of his somatization disorder, which ALJ Rippel found to be a "severe" mental MDI distinct from Samuel's physical MDIs. *See Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("The question of whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels."). Dr. Weiss expressly related Samuel's physical pain to his somatization disorder. *See* R. 542 (noting Samuel seemed "somewhat somatically preoccupied" and that his inability to do things "seem[ed] at least to some degree psychologically motivated"); R. 535 ("There is a very somatic element to the way he handles things."). ALJ Rippel recognized as much, *see* R. 25 ("The undersigned is aware that there is a mental component to the claimant's chronic pain as addressed by his psychiatrist . . . ."), and he offered some analysis of Samuel's somatization disorder. ALJ Rippel apparently disagreed with Samuel's treating psychiatrist that his somatization disorder played a role in his chronic physical pain, however, reasoning that Samuel

did not present with "obvious pain behaviors," he had "exhibited a full range of affect with small amplitude of emotions," and "despite his chronic pain, [Samuel] ha[d] been described as having normal cognition, concentration, attention, insight, and judgment." *Id.* (citing R. 535, 539, 543, 544–45). While ALJ Rippel acknowledged a "mental component" to Samuel's chronic pain, he "fail[ed] to recognize that the major, distinguishing characteristic of somatization disorder is the manifestation of physical symptomatology and he assign[ed] no such symptomatology to the severe mental disorder." *Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 521 (D. Md. 2002). This "raises the question as to whether the ALJ developed even a rudimentary understanding of the disease that he found claimant had, and which he found was a serious condition." *Id.* at 521–22. Here, ALJ Rippel's analysis falls short because he made the same mistake as in his analysis of Samuel's avoidant personality disorder. The ALJ found that Samuel had "severe" somatization disorder, which necessarily indicates that it caused more than minimal impact on his work-related functional abilities. Yet, in the RFC analysis, he seems to have determined that Samuel's somatization disorder had no impact on his pain or related functional limitations. If that is the case, the ALJ must explain the apparent inconsistency in his reasoning. Otherwise, the lack of explanation frustrates the Court's ability to review the decision for substantial evidence. *See Testamark v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018) ("Absent more thorough and well-reasoned explanation, we cannot conduct meaningful judicial review of the ALJ's conclusions.")

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Samuel's Motion for Summary Judgment, ECF No. 12, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: September 2, 2022

Joel C. Hoppe
United States Magistrate Judge